IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff, | §<br>§ | |
| | § | |
| v. | § | NO: 9:26-CV-00773 |
| | § | |
| 1,252.75513408 IN SOLANA,<br>364.3686592 IN SOLANA, AND<br>2.816661 IN BITCOIN,<br>Defendants. | §<br>§<br>§<br>§ | |

## AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Sophie Traynor, a Special Agent with the United States Service ("USSS" or "Secret Service") after being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Secret Service and have been since December 2024. I am currently assigned to the Houston Field Office. During my tenure with the Secret Service, I have been assigned to investigate violations of federal laws, including violations of Title 18 of the United States Code, and specifically those related to the passing of counterfeit United States currency and wire fraud. I have completed the Criminal Investigative Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the Special Agent Training Course at the James J. Rowley Secret Service Training Center in Beltsville, Maryland. The training pertained to criminal investigations of counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft. I am an investigative and law enforcement officer of the United States, in that I am empowered by law to conduct investigations and to make arrests for felony offenses, under authority of 18 U.S.C. § 3056.

2. The statements in this affidavit are based on my personal observations, my training and experience, information obtained from witnesses and other law enforcement officials, and review of records obtained during the course of investigation. This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge or investigation into this case.

## PROPERTY FOR FORFEITURE

3. This affidavit is made in support of a civil forfeiture complaint concerning the following personal property (collectively, the "Defendant Property"):

a. 1,252.75513408 Solana;

b. 364.3686592 Solana; and

c. 2.816661 Bitcoin.

4. This personal property was seized on or about December 18, 2025 in Lufkin, Texas via seizure warrant 9:25-MJ-24.

5. Based on the facts and circumstances set forth below, I submit that there exists probable cause to believe 2.816661 Bitcoin ("BTC") and 1,617.692 Solana ("SOL"), digital currencies, custodied at Coinbase under Coinbase ID 6033edff34b6c9030b76ebaf (the "SUBJECT ACCOUNT"), held in the name of Douglas Dennis Datin ("DATIN"), are subject to civil forfeiture. At the time of this writing, the BTC and SOL are believed to have a value of approximately $447,805.00 USD.

## LEGAL AUTHORITY FOR FORFEITURE

6. The funds in the SUBJECT ACCOUNT are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to… any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." Violations of 18 U.S.C. § 1343 (wire fraud) constitutes a "specified unlawful activity."

7. Under 18 U.S.C. § 984, for any forfeiture action in rem in which the subject property consists of cash, monetary instruments in bearer form, or funds deposited in an account in a financial institution:

a. The government need not identify the specific funds involved in the offense that serves as the basis for the forfeiture;

b. It is not a defense that those funds have been removed and replaced by other funds; and

c. Identical funds found in the same account as those involved in the offense serving as the basis for the forfeiture are subject to forfeiture.

8. In essence, 18 U.S.C. § 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept. The statute does not, however, allow the government to reach back in time for an unlimited period. A forfeiture action (including a seizure) against property not directly traceable to the offense that is the basis for the forfeiture cannot be commenced more than one year from the date of the offense.

9. Funds in a bank are fungible, thus making them subject to transfer or withdrawal with relative ease. Furthermore, I know that once U.S. Currency is

converted to cryptocurrency, the funds become difficult to recover and trace. A restraining order would be inadequate to preserve property of this type for forfeiture at trial. Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the government's custody upon execution of the warrant and, thus, preserved for forfeiture at trial.

## BACKGROUND ON CRYPTOCURRENCY

10. Cryptocurrencies or "digital currencies" are digital tokens—digital assets—of value circulated over the Internet as substitutes for traditional fiat currency. In contrast to fiat currencies, such as the U.S. dollar, cryptocurrencies are not issued by any government or bank but are instead generated and controlled through computer software. Bitcoin is the best-known digital currency in use; Solano is another type of cryptocurrency.

11. Cryptocurrency's addresses are the specific virtual locations to which such currencies are sent and received. Its "address" is analogous to a bank account number and is represented as a string of alphanumeric characters. Each cryptocurrency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's

private key can authorize a transfer of digital currency from that address to another address.

12. Many cryptocurrencies publicly record their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction that has ever occurred using that blockchain's specific technology. The blockchain can be updated multiple times per hour and records every cryptocurrency address that ever received that cryptocurrency. It also maintains records of every transaction and all the known balances for each cryptocurrency address. There are different blockchains for different types of cryptocurrencies.

13. Although the identity of an address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. A user of cryptocurrency can use multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize.

14. Cryptocurrencies are typically stored in a "wallet," a software application that interfaces with the cryptocurrency's specific blockchain and generates and stores a user's addresses and private keys. A cryptocurrency wallet also allows users to send and receive cryptocurrencies. Multiple addresses can be stored in a wallet. Wallets can come in a variety of forms, including "online wallets" that allow cryptocurrencies to be housed with an internet-based cloud storage provider.

15. Some companies, such as Coinbase, offer cryptocurrency wallet services that allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the "recovery seed" for a wallet (i.e., the password), law enforcement may be able to use this to recover or reconstitute the wallet on a new digital device and transfer the cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

## **FACTS SUPPORTING FORFEITURE**

16. Douglas Dennis DATIN and Jill Datin own a company called WHGC, LLC that operates the Woodland Hills Golf Club ("WHGC") in Nacogdoches, Texas, which is in the Eastern District of Texas. In July 2020, the Small Business Administration ("SBA") approved an application submitted by DATIN for an economic injury disaster loan ("EIDL") to assist with the operating expenses for WHGC. Based on the facts and circumstances set forth below, I submit that there exists probable cause

to believe that at least $447,805.00 of the funds in the SUBJECT ACCOUNT are traceable, via direct or circumstantial evidence, to wire fraud, in violation of 18 U.S.C. § 1343, and are subject to forfeiture.

**A. The CARES Act and EIDL Program.**

17. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted in March 2020, and designed to provide emergency financial assistance and alleviate the economic effects of the COVID-19 Pandemic. The Act created the EIDL program, administered by the SBA, to aid businesses suffering temporary loss of revenue resulting from the pandemic. Under the program, and as agreed to by recipients, loan proceeds were restricted in their use to the recipient's "working capital and normal operating expenses," such as continuing employee health care benefits, rent, utilities, and fixed debt payments. Because they were intended to ease economic concerns associated with the pandemic, the loans were repayable over extended periods and subject to low interest rates.

18. In July 2020, the SBA approved an EIDL application that DATIN submitted on behalf of WHGC through its bank, Southside Bank. A loan modification increasing the requested amount was approved in March 2022. In authorizing the loans, DATIN agreed that the EIDL proceeds would be used "solely as working capital" for WHGC, to alleviate economic injuries associated with the COVID-19 Pandemic. The loan was repayable over 30 years and subject to a 3.75% interest rate.

19. In total, between July 2020 and April 2022, the SBA disbursed $955,000.00 in EIDL proceeds to WHGC. Each disbursement was deposited into WHGC's business accounts at Southside Bank. On April 7, 2022, a final disbursement

of $794,931.00 in EIDL funds was deposited into WHGC's account at Southside Bank, Acct. No. 500006197. Prior to receiving this disbursement, the account had a balance of $52,052.44.

**B. The Unlawful Financial Transactions.**

20. DATIN and Jill Datin acquired WHGC, LLC in or about October 2007. They then obtained a $771,112.00 mortgage for the property from Southside Bank in May 2012.

21. On or about May 3, 2022, DATIN utilized the EIDL funds to make a lump-sum payment of $479,581.15 to Southside Bank to payoff and discharge the mortgage on WHGC's property. Such payment was in violation of the restrictions placed on the legitimate use of EIDL funds, as it was not a normal "operating expense" of WHGC. Apart from this transaction, funds were also unlawfully utilized by DATIN to acquire cryptocurrency. The EIDL funds distributed to WHGC were not authorized to be used to acquire cryptocurrency.

22. On or about February 22, 2021, DATIN opened the SUBJECT ACCOUNT with Coinbase, providing a copy of his driver's license and personally identifying information in the process. DATIN is the only person associated with the SUBJECT ACCOUNT. Records obtained from Coinbase indicate that WHGC's account at Southside Bank (Acct. No. 50006197), is the only bank account connected to the SUBJECT ACCOUNT, and the only bank account that has funded or otherwise transacted with the SUBJECT ACCOUNT.

23. Records obtained from Southside Bank and Coinbase indicate that despite the restrictions placed on the EIDL funds, in twelve transfers in April and May 2022,

DATIN transferred $286,261.00 of the funds from WHGC's bank account to the SUBJECT ACCOUNT, his personal cryptocurrency account:

| DATE | AMOUNT |
|---|---|
| 4/25/2022 | $ 15,000.00 |
| 4/26/2022 | $ 25,000.00 |
| 4/29/2022 | $ 25,000.00 |
| 5/2/2022 | $ 25,000.00 |
| 5/2/2022 | $ 25,000.00 |
| 5/5/2022 | $ 25,000.00 |
| 5/6/2022 | $ 24,000.00 |
| 5/10/2022 | $ 25,000.00 |
| 5/11/2022 | $ 25,000.00 |
| 5/12/2022 | $ 24,261.00 |
| 5/13/2022 | $ 23,000.00 |
| 5/20/2022 | $ 25,000.00 |
| **TOTAL** | **$ 286,261.00** |

24. Records obtained from Coinbase indicate that, prior to the above transactions, the SUBJECT ACCOUNT had a lifetime receipt of $259,876.00, across the following cryptocurrencies:

| CRYPTOCURRENCY | ESTIMATED US DOLLAR VALUE |
|---|---|
| 1.04431 Bitcoin (BTC) | $ 114,182.00 |
| 105.07 Polkadot (DOT) | $ 47.00 |
| 16.36977 Ethereum (ETH) | $ 72,380.00 |
| 8382.56 Polygon (MATIC) | $ 8,382.00 |
| 3,643,422 Shiba Inu (SHIB) | $ 48.00 |
| 286.46 Solana (SOL) | $ 36,247.00 |

Following the transfer of EIDL funds into the SUBJECT ACCOUNT, DATIN purchased 2.029687 BTC and 3,318.437 SOL. Of those assets, there was approximately 2.816661 BTC and 1,617.692 SOL remaining in the SUBJECT ACCOUNT when it was seized.

25. A transactional review of records obtained from Coinbase further shows that DOT, ETH, MATIC, and SHIB, cryptocurrencies that had been stored in the

SUBJECT ACCOUNT, currently have a zero balance. The account activity included substantial movement within the account, including purchases of other types of cryptocurrencies, using the existing assets (e.g., the DOT, ETH, MATIC, and SHIB). None of the funds have been transferred out of the SUBJECT ACCOUNT to other wallets or withdrawn.

26. My investigation indicates that DATIN developed a scheme to defraud the SBA (the EIDL Program) by, among other things, knowingly submitting a false application to Southside Bank and the SBA to obtain EIDL funds. In applying for the funds, DATIN represented that the proceeds would be used solely for purposes of supporting WHGC in covering its operational expenses. Despite these representations, DATIN's true intention was to enrich himself, namely by using the funds to purchase cryptocurrencies. The electronic submission of the false application for EIDL funds and the subsequent transfer of funds from Southside Bank to the SUBJECT ACCOUNT constitute wire transmissions in interstate commerce, and therefore violated 18 U.S.C. § 1343.

27. After being notified by USSS, Coinbase froze activity on the SUBJECT ACCOUNT. Based on the aforementioned probable cause, USSS sought and obtained a seizure warrant for the cryptocurrency in the SUBJECT ACCOUNT on December 17, 2025 and executed the seizure warrant the next day.

28. On January 16, 2026, the USSS received the Defendant Property from Coinbase.

**CONCLUSION**

29. I submit that this affidavit supports probable cause for the forfeiture of the Defendant Property seized from the SUBJECT ACCOUNT. Based on my experience and the information herein, there is probable cause to believe that the Defendant Property constitutes proceeds from a scheme to commit wire fraud in violation of 18 U.S.C. § 1343, which is a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1)), and are therefore subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

As provided in 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

STRAYNOR Digitally signed by STRAYNOR Date: 2026.09.14 14:04:59 -05'00'

Sophie Traynor
Special Agent
U.S. Secret Service